NMA:DAL
F#2011R00271

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against -                Cr. No. <u>11-857 (WFK)</u>

JOSE BARRERA,
     also known as "Travieso,"
JOSE CELESTINO GUILLEN-RIVAS,"
     also known as "Pirata," and
ABRAHAM IRAHETA,
     also known as "Lobo,"

              Defendants.

- - - - - - - - - - - - - - - - -X


THE GOVERNMENT'S MEMORANDUM OF LAW
<u>IN OPPOSITION TO THE DEFENDANTS' PRETRIAL MOTIONS</u>


                                  LORETTA E. LYNCH
                                  United States Attorney
                                  Eastern District of New York

Darren A. LaVerne
Assistant U.S. Attorney
(Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of
law in opposition to the pretrial motions filed by defendants
Jose Barrera, Jose Celestino Guillen-Rivas and Abraham Iraheta.
For the reasons set forth below, the defendants' motions should
be denied.

STATEMENT OF FACTS

I.   Background on MS-13

The case against the defendants arises from the
government's continuing investigation into the activities of the
violent street gang La Mara Salvatrucha, also known as "MS-13."
MS-13 – which was recently designated a transnational criminal
organization by the U.S. Department of Treasury – operates
through chapters, or "cliques," throughout the United States,
which report and funnel money to a central leadership based in
El Salvador.[1]  Since at least 1998, members of MS-13 in Queens
and Long Island have engaged in acts of violence directed at,
among others, members of rival gangs.  Most notably, in Queens,
MS-13 has engaged in street wars against rival gangs, including
the Latin Kings, the Bloods and, more recently, the Original
Flushing Crew ("OFC").  Those wars have resulted in the murder,

---

[1]    See "Treasury Sanctions Latin American Criminal
Organization," Department of Treasury Press Release, October 12,
2012, available at http://www.treasury.gov/press-center/press-
releases/Pages/tg1733.aspx.

shooting and assault of gang members on both sides, as well as their family members and innocent bystanders.

Upon joining the gang, MS-13 members agree to attack "chavallas," that is, members of other gangs, whenever possible. Gang membership is considered a lifetime commitment, with only rare exceptions that allow individuals to leave the gang.  MS-13 cliques raise funds through street-level narcotics sales and robberies and maintain inventories of firearms, ammunition and knives for use in assaults, attempted murders and murders. Firearms are issued to members for use in specific shootings, known as "jales," and are then returned to the clique.  Members pay dues to the clique treasurer, who uses the funds to purchase weapons and provide bail money, attorney funds and family assistance for members who have been arrested.  Clique members often carry out directives from regional, national and international MS-13 leaders, including orders to kill witnesses, rival gang members, and potential cooperating or defecting MS-13 members.  MS-13 cliques assist each other in illegally smuggling gang members back into the United States, acquiring firearms, distributing narcotics and in other criminal activity.

The evidence at trial will establish that Barrera and Iraheta were members of an MS-13 clique based in Flushing, Queens, and that as gang members they committed numerous crimes, including attempted murder and assault.  The evidence will

further show that defendant Guillen-Rivas was a member of an MS-13 clique in Virginia who committed crimes, including conspiracy to murder and to harbor illegal aliens, with members of the Flushing clique.

II.   The Indictment

The indictment charges the defendants with a series of crimes, all of which relate to their participation in MS-13, alleged to be an association-in-fact enterprise engaged in racketeering.  The charges are summarized below.

A. Count One – Racketeering

Count One charges defendants Barrera and Iraheta with engaging in racketeering from approximately July 2009 to December 2011, based on predicate acts of conspiracy to murder and attempted murder, committed as part of their participation in MS-13.  Among other things, the defendants are alleged to have been involved in efforts by MS-13 to kill members of OFC, a rival gang.  At trial, the government will prove that in July 2009 and September 2010, respectively, Barrera and Iraheta attacked members and associates of OFC with machetes, knives and other weapons in furtherance of these efforts.  The government will also prove that the defendant Iraheta conspired with other MS-13 members to kill a former associate of the gang.

### B. Count Two – Racketeering Conspiracy

Count Two charges the defendants Barrera and Iraheta with racketeering conspiracy, based on an agreement to commit the acts alleged in connection with Count One.

### C. Counts Four through Nine, Fourteen and Fifteen

These counts charge the defendants Barrera and Iraheta with, variously, conspiracy to murder, attempted murder, assault with a dangerous weapon and firearms offenses based on their involvement in the attacks on OFC and the former MS-13 associate alleged in connection with Count One.[2]

### D. Count Eleven – Conspiracy to Harbor Aliens

Count Eleven charges the defendant Guillen-Rivas with conspiring to harbor illegal aliens in the United States.  The evidence at trial will show that between December 2010 and December 2011, Guillen-Rivas plotted with members of the Flushing clique to help transport from Texas certain MS-13 members and associates who were not lawfully in the United States.

### E. Count Thirteen – Conspiracy to Murder

Count Thirteen charges Guillen-Rivas with conspiring to murder a member of MS-13 who was believed to have betrayed the gang by providing information to law enforcement.  The

---

[2]    Barrera is charged in Counts Four, Five, Eight and Nine.  Iraheta is charged in Counts Four, Five, Six, Seven, Fourteen and Fifteen.

evidence at trial will show that Guillen-Rivas believed the
target of the conspiracy had travelled to Queens, and that
Guillen-Rivas sought the assistance of members of the Flushing
clique to locate him.

F. <u>Count Sixteen – Threatening to Commit a Crime of Violence</u>

Count Sixteen charges the defendant Iraheta with
threating to commit a crime of violence.  The evidence at trial
will show that, on December 1, 2011, Iraheta, while brandishing
a baseball bat, threatened to assault a member of the New York
City Police Department who was attempting to arrest him.

G. <u>Count Seventeen – False Statement in an Application for
Alien Registration</u>

Count Seventeen charges the defendant Guillen-Rivas
with lying about his criminal history on his application for
Temporary Protected Status in the United States.  Among other
things, the defendant's false statements allowed him to continue
to remain in the United States and commit crimes as a member of
MS-13.

III. <u>The Title III Wire Tap</u>

In the course of its investigation, the government
sought an order, pursuant to 18 U.S.C. § 2518, authorizing the
government to intercept communications from a cell phone used by
Christian Merino, the "primero," or leader, of the Flushing

clique.  On December 2, 2010, the Honorable Jack B. Weinstein
issued an order authorizing the wiretap.

Special Agent Sean Sweeney of Homeland Security
Investigations ("HSI") submitted an affidavit in support of the
government's application for the order.[3]  Among other things,
Agent Sweeney indicated in his affidavit that the government had
used or considered numerous alternative investigative techniques
in effort to achieve the goals of the investigation.  (See
Exhibit A to defendant Barrera's motion (hereinafter "Barrera
Exh. A") at ¶¶ 50-69).  According to the affidavit, the
government had received intelligence from a cooperating witness
("CW-1"), conducted surveillance and obtained consensually
recorded conversations during the course of the investigation.
Agent Sweeney explained that while these techniques yielded
useful evidence, there were substantial limits to the type and
extent of information such techniques could produce.  For
example, CW-1 did not have complete knowledge of MS-13's
criminal activities or unrestricted access to its member base,
either domestically or internationally.  (Id. at ¶¶ 52-55).
Efforts at surveillance had been frustrated by the covert manner
in which MS-13 conducted its activities and wariness of law
enforcement.  (Id. at ¶¶ 58-61).

---

[3]    Agent Sweeney's December 1, 2010 affidavit is attached to
defendant Barrera's motion as Exhibit A.

Agent Sweeney further explained in his affidavit that, given the insularity of the MS-13 community, it would be difficult for an undercover agent to penetrate the organization. Similarly, use of search warrants, grand jury subpoenas and witness interviews would potentially alert MS-13 of the government's interest in its activities, while yielding little useful evidence until the government's investigation had progressed further. (Id. at ¶¶ 56-57, 62-64).

On January 6, February 3, March 3 and April 1, 2011, the district court issued orders of authorization extending the wiretap on Merino's phone.[4]  In affidavits submitted in support of each of the government's applications, Agent Sweeney described audio and text conversations that had been recorded as a result of the wiretap.[5]  During those conversations, Merino could be heard discussing with fellow MS-13 members – including the defendants Barrera, Iraheta and Guillen-Rivas – plans to commit murder, assault and other crimes.  The information yielded by the wiretap provided the government with evidence of crimes that it would not have obtained through other investigative measures.

---

[4]    The January 6, March 3 and April 1 orders were issued by Judge Weinstein.   The February 3 order was issued by the Honorable Allyne R. Ross.

[5]    Agent Sweeney's January 6, February 3, March 3 and April 1 affidavits are attached to defendant Barrera's motion as Exhibits B, F, H and I.

IV.  <u>The Arrest of Iraheta</u>

   A. <u>December 1, 2011 Arrest by NYPD</u>

        Approximately one month prior to defendant Iraheta's
arrest on the charges in this case, the NYPD apprehended Iraheta
in connection with a planned assault in Flushing, Queens.[6]  On
December 1, 2011, HSI agents received intelligence that Iraheta
and other MS-13 members were plotting to attack rival gang
members in the area and might be armed with a gun.  That
evening, having been briefed by HSI, NYPD Detective Enio
Bencosme and Lieutenant Gerald Pizzano attempted to intercept
Iraheta and the others before they could carry out the assault.

        Detective Bencosme and Lieutenant Pizzano drove in an
unmarked police car to the apartment building where Iraheta
lived.  As they approached the building, Detective Bencosme
observed Iraheta and three other men standing out in front.  As
the officers pulled up to the men, Iraheta picked up a bat.
When Detective Bencosme stepped out of the car, Iraheta swung
the bat in an upward direction.  Bencosme, who had drawn his
firearm, identified himself as a police officer and told Iraheta
to put the bat down.  Iraheta refused to comply, and shouted, in
sum and substance, "Go ahead and shoot me, I'm going to fuck you
up!"  Iraheta refused to comply with the officers' direction to

---

[6]     If called as a witness at a hearing in this matter, NYPD
Detective Enio Bencosme would testify to the facts set forth
below.

lie face down on the ground and give up his hands so that they could apply handcuffs.  Iraheta continued to resist arrest, shouting "I'm going to fuck you up, I'm going to kill you!"  Iraheta was eventually restrained, placed under arrest and transported to the precinct.

Within a few days of the December 1 arrest, Detective Bencosme approached the owner of the building in front of which Iraheta had been apprehended.  At the building, Bencosme reviewed a video recording from one of the building's surveillance cameras that captured the arrest.  The recording, which lacked audio, corroborated Bencosme's recollection of how the arrest unfolded, including the fact that Iraheta had brandished a baseball bat at him.  Bencosme obtained a copy of the video on a small "thumb" drive and took the drive back to his office.

Bencosme was unable to open the file containing the recording on his computer in the office.  As a result, he took the thumb drive home in order to attempt to view it on his laptop computer.  Since that date, Bencosme has been unable to locate the drive.[7]

---

[7]     Attached hereto as Exhibit A is a sworn declaration by Detective Bencosme, attesting to the facts regarding the loss of the video.

B. January 5, 2012 Arrest by HSI

On December 31, 2011, a grand jury in this district returned the indictment in this case and a warrant was issued for Iraheta's arrest.

On January 5, 2012, HSI agents and NYPD officers arrested Iraheta at his home in Flushing, Queens.[8]  Six HSI agents and two NYPD officers participated in the arrest.  Prior to executing the warrant, the group was advised that during the December 1 arrest noted above, Iraheta had resisted arrest and brandished a bat.  Special Agent Timothy Varian, who led the group, also recalls being advised that Iraheta had previously used a machete and that a machete might be found on the premises.  One team of agents was tasked with entering Iraheta's apartment and another group was tasked with remaining outside the building to insure that Iraheta did not flee.

In the early morning, Agent Varian knocked on the door to Iraheta's apartment and announced "police."  The agents heard movement from inside the apartment.  At the same time, agents posted outside the building radioed that they saw someone attempting to climb out of the apartment window.  The agents decided to ram the door.

---

[8]     If called as witnesses at a hearing in this matter, HSI Special Agent Timothy Varian and NYPD Detective Liam Swords would testify to the facts set forth below.

Upon entry, the agents attempted to locate Iraheta and secure the apartment.  The agents found that there were three bedrooms in the apartment.  The door to one bedroom was open; inside the agents found a Hispanic male, who was placed in handcuffs.  The door to another bedroom was closed.  NYPD Detective Liam Swords heard movement inside the bedroom.  The agents rammed the bedroom door and Swords, accompanied by one other agent, entered the bedroom.  In the room, Swords discovered another Hispanic male attempting to climb out of the window.  The agents restrained the man and placed him in handcuffs.

Detective Swords also found Iraheta in the room, lying on a sleeping mat on the floor, with a cover pulled over his body.  Swords directed Iraheta to "show his hands."  Iraheta failed to do so.  Instead, Iraheta began to reach for a machete, the handle and first few inches of which were in plain view, on the floor between the sleeping mat and the wall.  Detective Swords attempted to subdue Iraheta and put him in handcuffs.  Iraheta continued to resist arrest but was eventually restrained and placed under arrest.

Special Agent Varian, who entered the room after Swords had restrained Iraheta, advised Iraheta of his Miranda rights, which Iraheta acknowledged he understood.  Iraheta consented to a search of his apartment.  He pointed Agent Varian

11

to his driver's license and cell phone and consented to a search
of the phone.  Shortly thereafter, Ireheta was transported to 26
Federal Plaza in Manhattan for processing.

Following processing, Special Agent Sweeney attempted
to interview Iraheta.  Other than denying that he was a member
of MS-13 and denying that he was known as "Lobo," Iraheta
declined to speak with Sweeney, who terminated the interview.

V.   The Arrest of Guillen-Rivas

On January 5, 2012, the defendant Guillen-Rivas was
arrested, pursuant to a warrant, outside his home in Fairfax,
Virginia.[9]  Agents arrested Guillen-Rivas without incident, on
the street, after he left his home and walked toward his car,
parked nearby.  After Guillen-Rivas was transported to Homeland
Security offices in Fairfax, he was advised of his Miranda
rights and agreed to waive those rights by signing a written
Advice and Waiver of Rights form.  (See Exhibit B, attached
hereto).  The form, which was written in Spanish, advised
Guillen-Rivas that, among other things, he had the right to
consult a lawyer before answering questions and to have a lawyer
present during the interview.  The form further advised Guillen-
Rivas that if he could not afford an attorney, one would be
appointed for him.  Agents Joseph and Dugan did not advise

_____

[9]   If called as a witness at a hearing in this matter, HSI
Special Agent Mick Joseph and FBI Special Agent Brian Dugan
would testify to the facts set forth below.

12

Guillen-Rivas, at any point, that he would not receive a lawyer until he appeared before the court in New York.

After agreeing to waive his rights, Guillen-Rivas was interviewed by Special Agents Joseph and Dugan.  Guillen-Rivas was cooperative and appeared eager to talk throughout the interview.  Among other things, Guillen-Rivas admitted that (i) he was a member of MS-13 and (ii) that he had called other MS-13 members and advised them that a fellow member named "Scooby" was a "rat" because he had cooperated with law enforcement against the gang.

That same day, Guillen-Rivas was transported to the district court in Alexandria, Virginia, where he was appointed counsel and arraigned on the indictment.

ARGUMENT

I.    Defendant Barrera's Motions Should Be Denied

   A.    The Government's Wiretap Application Complied With The Statutory Requirement Regarding Alternative Investigative Techniques

Defendant Barrera argues that the government did not adequately pursue alternative investigative techniques prior to seeking authorization for the wiretap on Merino's cell phone. He claims that the evidence obtained against Barrera through the wiretap should therefore be suppressed.  The Court should deny Barrera's motion. As set forth below, the government complied with its obligations under the wiretap statute by advising the

13

court of the other investigative methods it had tried or considered prior to seeking the wiretap, and the shortcomings of those methods.

### 1. Legal Standard

Before a court authorizes the interception of electronic communications, it must find that other investigative measures reasonably appear to be unlikely to succeed, be too dangerous, or to have been tried and failed.  See 18 U.S.C. § 2518(1)(c) and (3)(c); United States v. Giordano, 416 U.S. 505, 515 (1974); United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).  Such a requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." Kahn, 415 U.S. at 153 n.12.  A wiretap application must provide a practical basis for concluding that other investigative techniques are not feasible.  See United States v. Lilla, 699 F.2d 99, 103 (2d Cir. 1983) (citing S. Rep. No. 1097, 90th Congress, 2d Sess. 101).

As the Second Circuit has explained:

> [T]he purpose of the statutory requirements is not to
> preclude resort to electronic surveillance until after
> all other possible means of investigation have been
> exhausted by investigative agents; rather, they only
> require that the agents inform the authorizing
> judicial officer of the nature and progress of the
> investigation and of the difficulties inherent in the
> use of normal law enforcement methods.

14

United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990)
(quoting United States v. Vazquez, 605 F.2d 1269, 1282 (2d Cir.
1979)), abrogated on other grounds, see United States v. Marcus,
628 F.3d 36, 41-43 (2d Cir. 2010); see also United States v.
Aparo, 221 F. Supp. 2d 359, 370 (E.D.N.Y. 2002) (citing United
States v. Martino, 664 F.2d 860, 868 (2d Cir. 1981)); see also
United States v. Hogan, 122 F. Supp. 2d 358, 361 (E.D.N.Y. 2000)
(citing United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999)).
At most, the government must demonstrate only that normal
investigative techniques would prove difficult in exposing the
full extent of the criminal activity, not that they would be
doomed to failure.  See United States v. Scala, 388 F. Supp. 2d
396, 404 (S.D.N.Y. 2005).[10]

---

[10]    In Scala, the district court reviewed the propriety of a
New York State court's issuance of a wiretap in an organized
crime investigation and held that the requirements of
§ 2518(3)(c) had been established.  In reaching this conclusion,
the court rejected the defendant's arguments that the
government's prior success with physical surveillance and
confidential informants made a wiretap unnecessary.  The court
explained,

    [the defendant] incorrectly assumes that the purpose
    of the wiretaps was only to obtain evidence of the
    sort that the government already had succeeded in
    obtaining through its confidential informants,
    physical surveillance, and other measures.  The
    wiretaps, in contrast, were sought and authorized in
    order to allow law enforcement officers to intercept
    conversations thought necessary to explore matters
    that the government had not succeeded in investigating
    through available means.  These included the
    identities of [the defendant's] supervisors,

2. <u>Analysis</u>

In this case, there was a substantial basis for Judge Weinstein's decision to issue the wiretap based on the information contained in the affidavits submitted by Agent Sweeney.[11]  The affidavits set forth the other investigative means considered by the government and indicated why they could not be expected to achieve the government's investigative objectives.  (<u>See</u> <u>supra</u> 6-7).  And while certain investigative techniques – like the use of CW-1 – had yielded, and continued to yield, evidence useful to the investigation, § 2518 does not require that other investigative means be entirely fruitless. Rather, the statute only requires, again, that the court be informed of the "nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement

_____

assistants, employees, and victims, the locations of his gambling wirerooms, and the details as to how his gambling and loansharking activities were carried out.

388 F. Supp. 2d at 404; <u>see also</u> <u>Hogan</u>, 122 F. Supp. 2d at 365 ("The affiant also explained why traditional investigative techniques would not be successful in achieving the goals of the investigation, which were not merely the apprehension of the defendant, but the gathering of evidence beyond a reasonable doubt about his entire narcotics operation, including his suppliers, customers and subordinates.").

[11]  A reviewing court's determination as to whether a wiretap was properly authorized "is not <u>de novo</u> but is limited to determining whether [the] judicial officer had a 'substantial basis' for her determination." <u>United States v. Gotti</u>, 42 F. Supp. 2d 252, 262 (S.D.N.Y. 1999).

methods." <u>Torres</u>, 901 F.2d at 231 (internal quotation marks and
citation omitted).

         In support of his argument, Barrera points to evidence
that the government had been able to secure, separately from the
wiretap, admissions of wrongdoing from certain MS-13 gang
members, and had obtained a recording of a MS-13 gang meeting.[12]
But none of the evidence referenced by Barrera is inconsistent
with Agent Sweeney's assertion in his affidavits that
information obtained from individual MS-13 members, including
CW-1, would not give the government access to the full scope of
the gang's criminal activities.  (<u>See, e.g.</u>, Barrera Exh. A at ¶
48 (stating that the government was seeking, among other things,
the "full nature, extent and methods of the gang activities of
the subject interceptees and others as yet unknown"), ¶¶ 52-55
(setting forth limitations of use of CW-1)).  As indicated in
the affidavits, MS-13 "compartmentalizes aspects of its
operations so as to impede law enforcement's ability to identify
and dismantle the entire organization." <u>Id.</u> at ¶ 55.  Piecemeal
information obtained from individual gang members was, for that

---

[12]    With respect to the latter, Barrera suggests that the
meeting may have been recorded by an "undercover operative," and
that, if so, this fact undercuts Agent Sweeney's assertion that
use of undercover agents was not likely to be productive in
penetrating MS-13.  Contrary to Barrera's claim, the recording
was obtained through CW-1, not an undercover agent.

reason, among others, not reasonably likely to yield the same
kind of evidence that would become available through a wiretap
on Merino, the leader of the Flushing clique.

Accordingly, the Court should deny Barrera's motion to
suppress evidence from the wiretap on Merino's phone.

B.   There Is No Basis For A Franks Hearing

Barrera further claims that an evidentiary hearing is
warranted in light of what he characterizes as "material
representations" as to the basis for probable cause in Agent
Sweeney's affidavits.  (Deft. Mem. at 12).  First, Barrera
argues that Agent Sweeney's assertion, in his January 6, 2011
affidavit, that another gang member, Rudy Guembes-Lorena, had
been a participant in telephone conversations reflecting
criminal activity is undercut by Sweeney's testimony, in another
case, that as of February 4, 2011, he had no information that
Guembes-Lorena had been involved in criminal activity.  Second,
Barrera claims that the March 3 and April 1, 2011 affidavits
erroneously stated that the government had not been able to
learn the actual name of another gang member known as "Negro."

1. Legal Standard

In Franks v. Delaware, 438 U.S. 154 (1978), the
Supreme Court authorized the suppression of evidence obtained
pursuant to a warrant only in an extremely narrow category of
cases.  The Court found that because the Warrant Clause requires

18

a factual showing of probable cause, "the obvious assumption is
that there will be a truthful showing."  Id. at 164 (internal
quotation marks omitted; emphasis in original).  The Court,
however, cautioned that "truthful" does not mean that "every
fact recited in the warrant affidavit is necessarily correct."
Id. at 165.  Rather, the Court recognized that probable cause
may be founded upon "information within the affiant's own
knowledge that sometimes must be garnered hastily.  But surely
it is to be 'truthful' in the sense that the information put
forth is believed or appropriately accepted by the affiant as
true."  Id.  The Court established a two-part test to determine
whether an evidentiary hearing is necessary on the question of
whether the government has provided truthful information.
First, "[t]here must be allegations of deliberate falsehood or
of reckless disregard for the truth, and those allegations must
be accompanied by an offer of proof."  Id. at 171.  Second, even
if these requirements are met,

> if, when material that is the subject of the
> alleged falsity or reckless disregard is set
> to one side, there remains sufficient
> content in the warrant affidavit to support
> a finding of probable cause, no hearing is
> required.

Id. at 171-172.

Since Franks, courts have interpreted very narrowly
the first prong of the Franks test, i.e., "deliberate falsehood

19

or reckless disregard for the truth." For example, in <u>United States v. Fermin</u>, the Second Circuit found no "intentional misleading" of the authorizing judge, despite the fact that the supporting affidavit that relied largely on information from a confidential informant failed to mention, among other things, that the confidential informant had stolen a gun from the office of an Assistant U.S. Attorney. 32 F.2d 674, 676 (2d Cir. 1994), <u>overruled on other grounds</u>, <u>Bailey v. United States</u>, 516 U.S. 137 (1995). Furthermore, the burden of proof in showing deliberate falsehood or reckless disregard for the truth rests squarely with the defendant, and any such allegations must make a "substantial preliminary showing" that is "'accompanied by an offer of proof. . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence explained.'" <u>United States v. Labate</u>, 2001 WL 533714, at *17 (S.D.N.Y. May 18, 2001) (quoting <u>Franks</u>, 438 U.S. at 171).

   2. <u>Analysis</u>

   In this case, Barrera cannot show that a hearing is warranted under either prong of the <u>Franks</u> standard.

    i.  <u>Guembes-Lorena</u>

   Barrera does not appear to allege that Agent Sweeney, in his January 6 affidavit, deliberately or recklessly misrepresented the fact that Guembes-Lorena was recorded discussing criminal activity with Merino on the target cell

phone.  Indeed, verbatim translations of portions of the recordings are set forth in the affidavit, and the entirety of those recordings have been provided to Barrera by the government.  Barrera cites nothing in the recordings suggesting that the affidavit's characterization of the conversations between Merino and Guembes-Lorena was misleading.  Rather, Barrera appears to be alleging that Agent Sweeney misrepresented the truth during his testimony in separate proceedings related to Guembes-Lorena's violation of supervised release, by stating that he did not have information that Guembes-Lorena had been involved in criminality.[13]  Even were it true, that assertion would not warrant a <u>Franks</u> hearing in this case.

---

[13]    On September 7, 2011, Agent Sweeney testified at a violation of supervised release hearing in <u>United States v. Guembes-Lorena</u>, 07-CR-116 (SJ).  (The hearing transcript is attached to Barrera's motion as Exhibit D.)  The violation allegation was based largely on admissions Guembes-Lorena had made to Agent Sweeney following his arrest on February 4, 2011. In the course of cross-examination by defense counsel, Sweeney was asked whether, on a prior occasion in January 2011, when he went to advise Guembes-Lorena of a threat on his life, he had information that Guembes-Lorena was "participating in any criminal activity."  Agent Sweeney mistakenly indicated that he did not.  (Tr. 11).  While Sweeney misspoke during his testimony, his answer tended to help Guembes-Lorena's position in that case rather than hurt it.  At the hearing, defense counsel was seeking to establish that the government had no basis for the supervised-release violation other than the post-arrest statements made by Guembes-Lorena himself.  That argument would have been substantially undermined had Agent Sweeney stated that there were recordings reflecting additional criminality by Guembes-Lorena.

Given that Barrera has not made a substantial preliminary showing that Agent Sweeney's January affidavit supporting the issuance of the wiretap order was deliberately or recklessly false – or even false at all – he is not entitled to a Franks hearing.  Moreover, even if Barrera had made such a showing, any such misrepresentation would have been immaterial to issuance of the order, given the abundance of other evidence proffered establishing probable cause that Merino's phone would yield evidence of criminality.  In addition to the recordings involving Guembes-Lorena, Agent Sweeney's affidavit described eight other conversations captured on Merino's phone reflecting criminal and/or gang-related activity, including assault and alien smuggling.  (See Barrera Exh. B at ¶¶ 21-24, 29-31 and 35).  These conversations provided ample basis for the probable cause finding by Judge Weinstein.

ii.  "Negro"

Barrera further claims that a Franks hearing is warranted because Agent Sweeney's March 3 and April 1 affidavits erroneously stated that law enforcement had been unable to determine the true name of a gang member known as "Negro."  (See Barrera Exhibits H and I at ¶¶ 75 and 65, respectively). As Barrera points out, elsewhere in those same affidavits, Agent Sweeney indicated that the government had identified Negro as Alex Machado, and recorded Merino speaking with Machado about

criminal activity.  (See id. at ¶¶ 1, 33, 37-38 and 1,
respectively).  But while Barrera is correct that there is an
error in the affidavits, he has not made a "substantial
preliminary showing" of deliberate falsehood or reckless
disregard for the truth.  Labate, 2001 WL 533714, at *17.
Rather, given that the statements regarding Negro's true name
are contradicted by Agent Sweeney's own statements elsewhere in
the same affidavits, it is clear that the error was simply the
result of an oversight in updating prior versions of the
affidavit to account for new facts learned in the course of the
investigation, rather than a calculated effort to mislead the
Court.  Indeed, the December, January and February affidavits
all include the same statement regarding law enforcement's
inability to determine Negro's true name.  (See Barrera Exhibits
A, B and F at ¶¶ 67, 75 and 74, respectively).

        In addition, Barrera has not shown that this error was
material to the issuance of the March and April wiretap orders.
The inability to learn the identity of Negro was but one of many
reasons cited by Sweeney as to why other investigative
techniques were insufficient to achieve the purposes of the
investigation.  (See supra 6-7).  There is nothing to suggest
that Judge Weinstein's decision to issue the wiretap orders was
based wholly or substantially on an assertion, contained in one

or two sentences of a 50-page affidavit, regarding the identity of a single co-conspirator.

　　　　For these reasons, the Court should deny Barrera's motion for a <u>Franks</u> hearing.

　　C.　　<u>Barrera Is Not Entitled To The Requested Discovery</u>

　　　　Barrera claims that, pursuant to Federal Rule of Criminal Procedure 16, the government must produce to him law-enforcement reports relating to "any co-defendant or individual referenced in the wiretap affidavits," as well as "any statement to law enforcement by a co-defendant or individual named or referenced in the affidavits relating to the charges, the defendants or MS-13," excluding "active cooperating witness[es]." (Deft. Mem. at 13-14). Barrera argues that these documents are "material to preparing the defense," and thus discoverable under Rule 16(a)(1)(E)(i), because they bear on the issue of whether alternative investigative techniques were sufficient to achieve the goals of the investigation, and thus on the merits of his motion to suppress evidence obtained through the wiretap on Merino's phone. Because the documents sought by Barrera are (i) protected from disclosure and (ii) immaterial to the court's decision to issue the wiretaps, his motion should be denied.

　　　　First, Rule 16(a)(2) bars discovery of "of reports, memoranda, or other internal government documents made by an

attorney for the government or other government agent in connection with investigating or prosecuting the case." Accordingly, internal reports generated by federal or local law enforcement in the course of the investigation of this case are not discoverable under Rule 16.  See, e.g., United States v. Jenkins, 2003 WL 1461477, at *5 (S.D.N.Y. March 21, 2003) (quashing Rule 17(c) subpoena to New York City Police Department for "all stop, question and frisk reports and memo book entries relating to the stop of the Defendant," on the ground that such materials would not be discoverable under Rule 16).  Similarly, Rule 16(a)(2) provides that Rule 16 does not "authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. §3500."[14] To the extent Barrera is seeking the statements of witnesses who the government might call at trial, such statements are clearly not discoverable at this time.

Second, even assuming, as is suggested by Barrera, that the referenced documents contain additional information regarding MS-13 gathered by the government prior to its wiretap application, there is no basis for Barrera's claim that such information would have been material to Judge Weinstein's decision to issue the wiretap orders.  Agent Sweeney's

---

[14]    Title 18, United States Code, Section 3500 provides in substance that witness statements shall not be produced until the witness has testified on direct examination at trial.

affidavits made clear that the government had successfully obtained information about MS-13 from a number of sources, including "debriefings of multiple MS-13 gang members," "street suppression activities" and "responses to reports of MS-13-related activity." (See, e.g., Barrera Exh. A at ¶ 14). The Court was thus apprised of the fact that alternative investigative techniques had yielded evidence of criminality prior to issuance of the wiretap. There is no requirement that the government describe in its wiretap application every detail of every arrest and witness interview conducted in the course of its investigation. Nor, as is set forth at length supra 14-15, does the wiretap statute require that the government demonstrate that other investigative measures have been fruitless. The existence of additional information regarding the arrest and statements of other MS-13 gang members is thus immaterial to Barrera's motion to suppress.

Accordingly, Barrera's claim that law-enforcement reports and witness or co-defendant statements must be produced pursuant to Rule 16 is without merit.[15]

---

[15]  Barrera also seeks, pursuant to Brady v. Maryland, 373 U.S. 83 (1963), disclosure of "any victim report prepared by law enforcement relating to the charges or an incident mentioned in the wiretap affidavits." At this time, the government is not aware of any Brady material in victim reports or otherwise. The government understands its Brady obligations and will continue to comply with them.

D.   <u>Barrera Is Not Entitled To A Bill Of Particulars</u>

Finally, Barrera claims that he is entitled, pursuant to Federal Rule of Criminal Procedure 7(f), to a bill of particulars with respect to Racketeering Act One[16] and Count Four, both of which charge Barrera with participating in a conspiracy to murder members of a rival gang, the Original Flushing Crew.  Contrary to Barrera's assertion, the indictment provides him with sufficient notice of the crimes with which he is charged.  His motion is therefore without merit.

1. <u>Legal Standard</u>

Under Rule 7(c) of the Federal Rules of Criminal Procedure, an indictment need only set forth a "plain, concise and definite written statement of the essential facts constituting the offense."  Additional details, in the form of a bill of particulars, are not appropriate unless the indictment is too vague to inform the defendant of the nature of the charges to allow the preparation of a defense, avoid unfair surprise and allay double jeopardy concerns.  <u>See</u> <u>United States</u> <u>v. GAF Corp.</u>, 928 F.2d 1253, 1260 (2d Cir. 1991); <u>United States</u>

---

[16]   The reference in Barrera's motion to Racketeering Act Three appears to be in error, as that section of the indictment charges Barrera with the attempted murder of John Doe #2 on September 24, 2010.  Elsewhere in Barrera's motion he indicates that he is seeking particulars ofthe murder conspiracy alleged to have occurred between July 2009 and the date of the indictment, which is what is charged in both Racketeering Act One and Count Four.

v. Torres, 901 F.2d 205, 234 (2d Cir. 1990).  If the information
sought by the defendant is provided in the indictment or through
some other means, a bill of particulars is not warranted.  See
United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999); United
States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).

Because the "[a]cquisition of evidentiary detail is
not the function of the bill of particulars," Torres, 901 F.2d
at 234 (internal quotation marks omitted), it is not to be used
as a vehicle to "compel disclosure of how much the government
can prove and how much it cannot, nor to foreclose the
government from using proof it may develop as the trial
approaches."  United States v. Malinsky, 19 F.R.D. 426, 428
(S.D.N.Y. 1956); see also, e.g., United States v. Davidoff, 845
F.2d 1151, 1154 (2d Cir. 1988) (government need not
particularize all of its evidence); United States v. Rigas, 258
F. Supp.2d 299, 304 (S.D.N.Y. 2003) (bill of particulars not
meant to lock Government into its proof); United States v.
Ianniello, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985) ("To require
most of the further disclosure the defendants seek would do
little more than restrict the government's proof at trial, which
is not the purpose of a bill of particulars.").

Moreover, a bill of particulars is not a general
investigative tool for the defense, United States v. Salazar,
485 F.2d 1272, 1278 (2d Cir. 1973);  United States v. Mannino,

480 F. Supp. 1182, 1185 (S.D.N.Y. 1979); nor is it a device to
compel disclosure of the government's evidence prior to trial.
See United States v. Gottlieb, 493 F.2d 987, 994 (2d Cir. 1974);
United States v. Lebron, 222 F.2d 531, 535-36 (2d Cir. 1955).
Rather, it is designed to give the defendant only that minimum
amount of information necessary to permit him to conduct his own
investigation.  United States v. Smith, 776 F.2d 1104, 1111 (3d
Cir. 1985); United States v. Cisneros, 26 F. Supp.2d 24, 55-56
(D.D.C. 1998).

     2. Analysis

     In this case, the indictment sets forth the intended
victims of the murder conspiracy (OFC gang members), the
location of those victims (Flushing, Queens) and the approximate
dates during which Barrera conspired to kill them (between July
2009 and December 30, 2011).  The indictment further advises
Barrera of the names of two other gang members who joined him in
the conspiracy, Abraham Iraheta and Christian Merino.  Barrera
has thus been provided with sufficient information to allow him
to prepare his defense and to allay any double jeopardy
concerns.  As noted, he is not entitled to additional
evidentiary detail or to a roadmap of the government's proof at
trial.

     Accordingly, the Court should deny Barrera's motion
for a bill of particulars.

II.  Defendant Iraheta's Motions Should Be Denied

    A. Count Sixteen Should Not Be Dismissed

        Iraheta claims that Count Sixteen, charging him with threatening to commit a crime of violence, should be dismissed because Detective Bencosme lost the video capturing Iraheta's arrest on December 1, 2011.  In the alternative, Iraheta requests an evidentiary hearing into "the circumstances of the loss and/or destruction of the video."  (Decl. of Joel Stein, Esq. at ¶ 15).

        As Iraheta appears to recognize, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  Arizona v. Youngblood, 488 U.S. 51, 109 (1988); see also United States v. Davis, 2012 WL 3194313, at *2 (2d Cir. Aug. 8, 2012) (summary order) (quoting Youngblood); United States v. Hunley, 476 Fed. Appx. 897, 899 (2d Cir. April 17, 2012) (summary order); United States v. Sommer, 815 F.2d 15 (2d Cir. 1987) ("'sanctions should not be imposed on the government for the loss of [discoverable] material.'" (quoting United States v. Grammatikos, 633 F.2d 1013, 1019 (2d Cir. 1980)).  Accordingly, unless Iraheta can establish that Detective Bencosme intentionally destroyed or lost the video, there is no basis for his claim that Count

Sixteen should be dismissed or that other sanctions on the government should be imposed.

As is clear from Detective Bencosme's sworn declaration, he did not intentionally lose or destroy the video. Accordingly, Iraheta's motion to dismiss Count Sixteen should be denied.  Moreover, the Court should decline to hold an evidentiary hearing on the matter.  Bencosme's declaration sets forth the material facts regarding how he lost the video, including the fact that he did not lose it intentionally.  While Iraheta's affidavit alleges that the video would have corroborated his own version of events, he has not proffered any facts or adduced any evidence indicating that Bencosme acted in bad faith.  In light of this, a hearing is not warranted.  Cf. United States v. Singh, 2012 WL 2501032, at *2 (June 27, 2012 E.D.N.Y.) (denying request for suppression hearing where defendant failed to submit an affidavit rebutting the government's version of events).

   B. The Machete, Driver's License And Cell Phone Recovered
      From Iraheta Should Not Be Suppressed

Iraheta claims that he did not consent to a search of his bedroom or his cell phone and that the machete, cell phone and driver's license seized upon his arrest should therefore be suppressed.  Iraheta further claims that the machete was not in plain view, but rather was behind a chest of drawers in his

31

room.  In the alternative, Iraheta requests a suppression
hearing.

     A warrantless search does not violate the Fourth
Amendment if "the authorities have obtained the voluntary
consent of a person authorized to grant such consent." United
States v. Elliot, 50 F.3d 180, 185 (2d Cir. 1995).  Consent to
search must be given voluntarily, but one need not be advised of
the right to refuse consent in order to provide voluntary
consent.  Schneckloth v. Bustamonte, 412 U.S. 218, 241–42
(1973).  Moreover, while the voluntariness of consent given by a
defendant in custody requires "more careful scrutiny," United
States v. Wiener, 534 F.2d 15, 17 (2d Cir. 1976), a defendant
may voluntarily give consent after being placed under arrest and
handcuffed, see United States v. Kon Yu-Leung, 910 F.2d 33, 41
(2d Cir. 1990).

     In this case, Iraheta consented to a search of his
apartment and cell phone after being advised of his Miranda
rights.  (See supra 11-12).  There is no evidence that he was
coerced or threatened into waiving his rights.  To the contrary,
as noted, Iraheta himself directed the agents to his cell phone
and driver's license.  The search of the apartment and cell
phone was therefore lawful.

     Moreover, the agents had grounds, separate and apart
from consent, to seize the machete lying on the floor between

32

Iraheta's sleeping mat and the wall.  First, as noted supra 11, the machete was in plain view, and thus subject to seizure. See, e.g., United States v. Escobar, 805 F.2d 68, 72 (2d Cir. 1986).  Second, the machete was lying in an area within Iraheta's reach (indeed, Iraheta was in fact reaching for it while Detective Swords was attempting to handcuff him), and the agents were thus authorized to secure it in order to protect themselves.  See, e.g., United States v. Hernandez, 941 F.2d 133, 137 (2d Cir. 1991).  Accordingly, the Court should deny Iraheta's motion to suppress.

Iraheta argues that, should the Court determine that a suppression hearing is warranted, the government should be required to produce for interview by defense counsel three individuals whom he characterizes as "cooperating witnesses." The asserted basis for this request is that the three witnesses had allegedly, on occasions prior to Iraheta's arrest, been to his apartment and seen the machete stored behind a dresser, where Iraheta claims it was hidden on the day of his arrest.

"[T]he Constitution does not provide a criminal defendant with an absolute right to confront a confidential informant in person.  Rather, the trial judge must 'balanc[e] the public interest in protecting the flow of information against the individual's right to prepare his defense.'" Edwards v. Phillips, 2007 WL 1834828, at *3 (S.D.N.Y. June 26,

2007) (quoting <u>Roviaro v. United States</u>, 353 U.S. 53, 62 (1957)).  In weighing these competing interests, the defendant bears the "heavy burden of showing that disclosure [is] essential to the defense."  <u>United States v. Flaherty</u>, 295 F.3d 182, 202 (2d Cir. 2002) (internal quotation marks and citations omitted).  "He must show more than simply that the informant was a participant in or witness to the crime charged, or that the informant might cast doubt on the general credibility of a government witness; speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden."  <u>Id.</u> (internal quotation marks and citations omitted).

Under this standard, Iraheta has not provided a basis for requiring the government to identify its witnesses at trial, much less to "produce them for interview" prior to a suppression hearing.  The claim that the three individuals might have information about where the machete was stored on dates other than Iraheta's arrest is speculative, and of minimal relevance to the question of where law enforcement observed the machete when Iraheta was arrested.  It certainly cannot be said to be "essential to the defense." Indeed, should the Court find that Iraheta consented to a search of the apartment, the issue of where in the apartment the machete is stored would be entirely irrelevant.  To be weighed against Iraheta's proffer is the

34

public interest in insuring that witnesses are not harassed,
threatened or killed.  Given that Iraheta has been indicted as a
member of a violent criminal enterprise known to obstruct
justice by intimidating witnesses, and charged with murder
conspiracy and similarly violent crimes, the government's
interest in guarding the identity of its witnesses is very
substantial. The Court should therefore deny Iraheta's motion.

   C. Iraheta's Post-Arrest Statements Should Not Be Suppressed

        Finally, Iraheta asserts that his post-arrest
statements to law enforcement should be suppressed because, he
claims, he was not advised of his Miranda rights prior to
questioning.

        As indicated supra 11, Special Agent Varian in fact
advised Iraheta of his rights following his arrest on the
morning of January 5, 2012.  Shortly thereafter, Iraheta was
transported to Homeland Security offices at 26 Federal Plaza in
Manhattan for processing.  After Iraheta was processed, Special
Agent Sweeney attempted to interview him.  Iraheta declined to
talk, other than to deny that his nickname was "Lobo" and that
he was an MS-13 member.  Iraheta was not threatened in any
manner or coerced into making these statements.  Given that he
had been advised of his Miranda rights earlier in the day,
Iraheta's statements are admissible at trial.  See United States
v. Banner, 356 F.3d 478, 480 (2d Cir. 2004) ("It is well

established that once an arrested person has received a proper Miranda warning, the fact that questioning is stopped and then later resumed does not necessarily give rise to the need for a new warning."); United States v. Davis, 2009 U.S. Dist. LEXIS 19401, at *38 (S.D.N.Y. March 11, 2009) (renewed warnings between interviews necessary only where "the defendant's circumstances have changed so seriously that the defendant's answers are no longer voluntary or his waiver of rights is no longer knowing and intelligent.")

III. Defendant Guillen-Rivas' Motions Should Be Denied

A. Guillen-Rivas Is Properly Joined With The Other Defendants In This Case under Rule 8(b)

Guillen-Rivas claims that (i) the three counts alleged against him are not properly joined with one another under Federal Rule of Criminal Procedure 8(a) and (ii) the counts against him are not properly joined with the counts against the other defendants named in the indictment under Rule 8(b).

1. Legal Standard

When multiple offenses and defendants are joined in the same indictment, a motion to sever is properly made under Rule 8(b), regardless of whether the defendant seeks severance of offenses or of defendants.  See United States v. Turoff, 853 F.2d 1037, 1042 (2d Cir. 1988).  Rule 8(b) provides that joinder is permissible where the defendants are alleged to "have

36

participated in the same act or transaction or in the same
series of acts or transactions constituting an offense or
offenses."  The Second Circuit has found that joinder is
appropriate under this standard where the acts alleged in the
indictment are "unified by some substantial identity of facts or
participants or arise out of a common scheme or plan."  United
States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (internal
quotation marks and citations omitted).

The Second Circuit applies a "commonsense rule" when
considering whether joinder is appropriate, basing its decisions
on "whether, in light of the factual overlap among charges,
joint proceedings would produce sufficient efficiencies such
that joinder is proper notwithstanding the possibility of
prejudice to either or both of the defendants resulting from the
joinder."  United States v. Rittweger, 524 F.3d 171, 177 (2d
Cir. 2008) (citing United States v. Shellef, 507 F.3d 82, 98 (2d
Cir. 2007)); United States v. Turoff, 853 F.2d 1037, 1044 (2d
Cir. 1988); see also United States v. Stewart, 433 F.3d 273, 314
(2d Cir. 2006) (joinder of defendants proper where the case
would otherwise have "resulted in two essentially duplicate
trials").

The Second Circuit's approach reflects a "strong
interest in conducting joint trials for persons who have been
jointly indicted."  United States v. Coffey, 361 F. Supp. 2d

37

102, 120 (E.D.N.Y. 2005); see also United States v. Feyrer, 333
F.3d 110, 114 (2d Cir. 2003); United States v. Ventura, 724 F.2d
305, 312 (2d Cir. 1983).  This interest is substantial and is
motivated not only by efficiency, but also by a desire to avoid
"the scandal and inequity of inconsistent verdicts."  United
States v. Rucker, 32 F. Supp. 2d 545, 547 (E.D.N.Y. 1999)
(quoting Richardson v. Marsh, 481 U.S. 200, 210 (1987)).

2. Analysis

In this case, Guillen-Rivas is alleged to have been a
member of the same criminal enterprise, MS-13, as the other
defendants.  With respect to all three remaining defendants,
including Guillen-Rivas, the government expects to present at
trial the same evidence regarding the gang, including evidence
regarding its rules, organizational structure, interstate
operations and criminal activities.  The government will also
present proof that Guillen-Rivas conspired with members of
Barrera and Iraheta's Flushing clique, including the leader,
Christian Merino, to (i) harbor and transport MS-13 gang members
who were in the United States illegally (Count Eleven) and
(ii) kill a gang member suspected of cooperating with law
enforcement in order to maintain and increase his position in
MS-13 (Count Thirteen).  Much of the proof as to Guillen-Rivas
will thus overlap with the proof against Barrera and Iraheta,
and there is a substantial identity of facts and participants.

38

The government further expects that it will call some of the
same witnesses to testify against each of the defendants, all of
whom were captured speaking on the same wiretap.  Severing
Guillen-Rivas would thus result in significant inefficiencies
and is not warranted under Rule 8(b).

Guillen-Rivas argues that Count Seventeen, which
charges him with making false statements in an application for
alien registration, is "utterly different" from either of the
other two counts charged against him.  But courts have held in
similar cases that joinder is proper under Rule 8(b).  For
example, in United States v. Brown, 744 F. Supp. 558, 562–565
(S.D.N.Y. 1990), the court found that it was not appropriate
under Rule 8(b) to sever a count charging illegal entry against
one defendant from an indictment charging that defendant and a
co-defendant with narcotics conspiracy.  The court explained:

> It would have been impossible for [the defendant] to have
> committed the narcotics offenses charged without actually
> being present in the United States.  Since it is alleged
> that [the defendant's] presence in the United States was,
> itself, a crime, the substantive narcotics offenses and the
> illegal reentry count are sufficiently related for purposes
> of joinder under Rule 8(b).

Id. at 563.  See also United States v. Estrella, 2002 WL 655202,
at *1 (S.D.N.Y. 2002) (citing Brown).  Similarly, Guillen-Rivas
could not have remained in the United States and committed the
murder conspiracy and harboring offenses with which he is
charged in Counts Eleven and Thirteen, if he had not filed the

application containing his false statements and been granted
Temporary Protected Status by the immigration authorities.  The
false statements he is alleged to have made in Count Seventeen
were therefore essential to the commission of the other charged
crimes and should not be severed from the indictment.

    B. Severance Is Not Appropriate Under Rule 14

        A district court may sever pursuant to Federal Rule of
Criminal Procedure 14 if joinder "appears to prejudice a
defendant or the government."  Fed. R. Crim. P. 14(a); see also
United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003).
Prejudice for the purposes of Rule 14 exists only when there is
"a serious risk that a joint trial would compromise a specific
trial right . . . or prevent the jury from making a reliable
judgment about guilt or innocence."  Zafiro v. United States,
506 U.S. 534, 539 (1993).  The Second Circuit has clarified that
a defendant "must show that the prejudice to him from joinder is
sufficiently severe to outweigh the judicial economy that would
be realized by avoiding multiple lengthy trials."  United States
v. Walker, 142 F.3d 103, 110 (2d Cir. 1998) (internal citations
omitted).  The high burden on the defendant is justified because
"[a] certain amount of prejudice to a defendant is regarded as
acceptable given the judicial economies that result from
joinder."  United States v. Carpentier, 689 F.2d 21, 27 (2d Cir.
1982).

Here, Guillen-Rivas cannot demonstrate "severe" prejudice so as to warrant severance under Rule 14.  As he himself is charged with murder conspiracy and alleged to have been a member of MS-13, the allegations of violence and gang-membership against Iraheta and Barrera, all of which are of a similar nature as those charged against Guillen-Rivas, will not unfairly prejudice Guillen-Rivas.  And while the false statements and harboring charges against Guillen-Rivas allege a non-violent crimes, any "spillover" prejudice from the other counts can be mitigated by an instruction to the jury that it must consider the defendant's guilt for each count in the indictment separately, based on the evidence.  Given the interrelatedness of the charges and the substantial efficiencies in trying the counts together, the defendant has not met his heavy burden in arguing for severance under Rule 14.

## C. Guillen-Rivas' Post-Arrest Statements Should Not Be Suppressed

Finally, Guillen-Rivas argues that the post-arrest statements he made to agents should be suppressed because he did voluntarily waive either his Sixth Amendment or his Fifth Amendment right to counsel.  Specifically, while acknowledging that he was advised of his rights and signed a waiver form, Guillen-Rivas claims that the agents misled him by stating that "a lawyer would not be assigned to him until he was brought to

41

Court in New York . . . [and] that it might take as long as three weeks for that to occur." (Deft. Mem. at 10).

As set forth supra 12-13, the agents did not tell Guillen-Rivas that he would be unable to speak with an attorney until he reached New York.  Rather, as Guillen-Rivas himself appears to acknowledge (Deft. Mem. at 10), he was provided with written notice, in Spanish, that he had the right to consult with counsel before answering the agents' questions, the right to have an attorney present during questioning and the right to have counsel appointed if he could not afford one.  Rather than asking for a lawyer or refusing to answer any questions, Guillen-Rivas chose to sign the waiver and speak with the agents.

Accordingly, Guillen-Rivas voluntarily waived his rights and his motion to suppress should be denied.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the Court should deny the defendants' pretrial motions.

Dated:      Brooklyn, New York
            February 1, 2013

                                    Respectfully submitted,

                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York


                              By:   ___/s/_____
                                    Darren A. LaVerne
                                    Assistant U.S. Attorney
                                    718-254-6783


cc:  Zoe Dolan, Esq. (By ECF)
     Jeremy Gutman, Esq. (By ECF)
     Joel Stein, Esq. (By ECF)